FILED
CLERK, U.S. DISTRICT COURT
6/22/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: cd DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 8:22-cr-00085-DSF |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud Affecting a Financial Institution; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| JEFFREY SCOTT HEDGES, | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. §§ 1349, 2(b)]

A.  INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Defendant and the Relevant Entities

1.  Defendant JEFFREY SCOTT HEDGES was a resident of Irvine, California.

2.  Defendant HEDGES controlled the following bank accounts:

    a.  A bank account in his own name, doing business as "WCC Pro Touring," held at Wells Fargo Bank, N.A. ending in 7633 (the "Wells Fargo 7633 account");

b.   A bank account in the name of A.H., held at Citibank N.A. ending in 2981 (the "A.H. Citibank 2981 account");

3.   Defendant HEDGES also claimed to be the sole proprietor of the following California companies:  West Coast Chassis, West Coast Speed and Custom, WCC Pro Touring, Von Schoff Customs, Von Schoff Apparel, Scotts Motorsports, and S and A Designs.

4.   Loan Consultant 1 was an individual who worked at Company 1, a company based in New York that specialized in assisting small businesses with obtaining loans.  Company 1 was also associated with Company 3, which used the initials M.C. and also assisted businesses in obtaining loans and other financing.

The Paycheck Protection Program

5.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

6.   In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or

make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

7.  A business's PPP loan application was received and processed, in the first instance, by a participating financial institution. If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.

8.  PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

<u>The Economic Injury Disaster Loan Program</u>

9.  The Economic Injury Disaster Loan Program ("EIDL") was a United States Small Business Administration ("SBA") program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

10. The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

11. To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

12. EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold, as described in paragraph 11 above. Any funds issued under an EIDL loan were issued directly by the SBA.

13. EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

Relevant Lending Institutions

14. Company 2 was a financial technology company based in California. Company 2 participated in the PPP by, among other

things, acting as a service provider between small businesses and certain lenders.  Small businesses seeking PPP loans could apply through Company 2 for PPP loans.  Company 2 would review the loan applications.  If a loan application received by Company 2 was approved for funding, a partner lender, including Bank A, disbursed the loan funds to the applicant.  Bank A was a federally insured financial institution based in New Jersey.  Bank A was an SBA Preferred Lender and participated as a PPP lender to small businesses.

B.      THE OBJECT OF THE CONSPIRACY

15.    Beginning no later than in or around June 2020 and continuing until at least in or around February 2021, in Orange County and Los Angeles County, within the Central District of California, and elsewhere, defendant HEDGES conspired with Loan Consultant 1, and with others known and unknown to the United States Attorney, to commit wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1343.

C.      THE MANNER AND MEANS OF THE CONSPIRACY

16.    The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

a.     Defendant HEDGES and Loan Consultant 1, together with other coconspirators, would make, and cause to be made, false statements to the SBA and financial institutions, including Company 1 and Company 2, in connection with the fraudulent applications for PPP and EIDL loans for defendant HEDGES's companies, including false representations regarding the number of employees to whom the companies had paid wages and false certifications that the loans would be used for permissible business purposes.

      b.   Defendant HEDGES and Loan Consultant 1, together with other coconspirators, would electronically submit, and cause to be submitted, false and fictitious documents to the SBA and financial institutions, including Company 1 and Company 2, in support of the fraudulent PPP and EIDL loan applications, including false or fictitious tax documents, payroll records, and bank records.

      c.   Defendant HEDGES and Loan Consultant 1 used, and caused to be used, the personal identifying information of other individuals, who were neither defendant HEDGES nor Loan Consultant 1, to submit fraudulent applications for PPP and EIDL loans.

      d.   Defendant HEDGES and Loan Consultant 1 used, and caused to be used, email addresses, which they created and controlled, corresponding to the name of the individual representative or business applicant on the PPP and EIDL loan applications in order to make it appear as if the loan applications were legitimate and the purported individual representatives were, in fact, the individuals submitting the loan applications. This included applications submitted in the names of A.H. and C.H.

      e.   Defendant HEDGES and Loan Consultant 1 would direct that PPP and EIDL loan proceeds be deposited into bank accounts that defendant HEDGES controlled, including the Wells Fargo 7633 account and the A.H. Citibank 2981 account.

      f.   Defendant HEDGES and Loan Consultant 1 would use the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit and for the benefit of their coconspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs, such as to purchase luxury jewelry and luxury cars.

17. From in or about June 2020 and continuing until at least in or about February 2021, as a result of this scheme, defendant HEDGES submitted and caused to be submitted fraudulent PPP and EIDL loan applications seeking approximately $5,288,476, and actually received approximately $2,087,701 in PPP and EIDL proceeds to which he was not entitled.

D. OVERT ACTS

18. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant HEDGES, together with Loan Consultant 1, committed the following overt acts, within the Central District of California:

Overt Act No. 1: On or about June 29, 2020, defendant HEDGES electronically signed and submitted to Company 1 and Loan Consultant 1 a "working capital application" and provided Loan Consultant 1 with the names and details of various businesses for use in PPP loan applications.

Overt Act No. 2: On or about June 30, 2020, defendant HEDGES submitted or caused Loan Consultant 1 to submit a PPP loan application in the name of A.H., using A.H.'s personal information, to Company 2 (the "A.H. PPP application") seeking a PPP loan in the amount of $478,541, which application: (a) falsely represented that A.H. had 30 employees; and (b) falsely referenced employees for whom it had paid wages and payroll taxes with average monthly payroll expenses of $191,416.70.

Overt Act No. 3: On or about June 30, 2020, Loan Consultant 1 sent defendant HEDGES an email with the subject line, "Wire Instructions for [Company 1]" and instructed defendant HEDGES to wire 10% of the loan amount, or $47,854.10, to a specified bank account in

New York, with the request that defendant HEDGES "complete after you receive funds to satisfy account."

<u>Overt Act No. 4</u>:  On or about July 2, 2020, after Bank A transferred, via interstate wire, $478,571 into the A.H. Citibank 2981 account in response to the fraudulent submission of the A.H. PPP application, defendant HEDGES caused a domestic wire transfer of $350,000 to be made from the A.H. Citibank 2981 account to the Wells Fargo 7633 account, for which defendant HEDGES was the signatory.

<u>Overt Act No. 5</u>:  On or about July 3, 2020, as payment for Loan Consultant 1's assistance in the submission of the fraudulent loan application referenced in Overt Act No. 2, defendant HEDGES caused an interstate wire transfer of $47,854.10 to be sent to an account held in the name of M.C., which owns or controls Company 1, Loan Consultant 1's employer.

COUNT TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

19. The United States Attorney realleges paragraphs 1-8 and 14 and 16-18 here.

20. Beginning no later than in or around June 2020 and continuing until at least in or around February 2021, in Los Angeles County and Orange County, within the Central District of California, and elsewhere, defendant HEDGES knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant HEDGES knew belonged to another person, namely, the name of A.H. during and in relation to the offense of Conspiracy to Commit Wire Fraud, a felony violation of Title 18, United States Code, Section 1349, as charged in Count One of this Information.

FORFEITURE ALLEGATIONS

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offenses set forth in any of Counts One through Two of this Information.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses, including, but not limited to:

i. Approximately $14,184.29 seized from a Citibank N.A. account ending in 4686 on or about November 4, 2020;

ii. One 2013 Ferrari bearing California Vehicle Identification Number ("VIN") ZFF65TJA6D0190673, seized on or about November 4, 2020;

iii. One 2015 Ferrari F12 Berlinetta bearing California VIN ZFF74UFA1F0209946, seized on or about November 10, 2020; and

iv. One 2015 Ferrari bearing California VIN ZFF77XJA0F0210991, seized on or about November 4, 2020 (collectively, the "Forfeitable Property"); and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TRACY L. WILKISON
United States Attorney



SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Acting Chief, Major Frauds Section

SCOTT PAETTY
Assistant United States Attorney
Deputy Chief, Major Frauds Section